**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

ZACHARIAH G.,

          **Plaintiff,**

                                    **Civil Action 2:21-cv-1600**
      **v.**                           **Judge Michael H. Watson**
                                      **Magistrate Judge Jolson**
**COMMISSIONER OF
SOCIAL SECURITY,**

          **Defendant.**

<u>**REPORT AND RECOMMENDATION**</u>

Plaintiff, Zachariah G., brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB"), Child Disability Benefits ("CDB") and Supplemental Security Income ("SSI"). For the reasons set forth below, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.    BACKGROUND

Plaintiff filed his applications for DIB and CDB on November 28, 2018, and for SSI on January 3, 2019, alleging that he was disabled beginning September 29, 2011, due to post-traumatic stress disorder ("PTSD"), anxiety, depression, borderline personality disorder, attention deficit disorder ("ADD"), and attention deficit hyperactivity disorder ("ADHD"). (Tr. 296–305, 322). Plaintiff later amended his alleged onset date to August 23, 2013. (Tr. 46, 387). After his applications were denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a hearing on June 22, 2020, before issuing a decision denying Plaintiff's applications on August 27, 2020. (Tr. 39–76, 7–33). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision final for purposes of judicial review. (Tr. 1–6).

Plaintiff filed this action on April 6, 2021 (Doc. 1), and the Commissioner filed the administrative record on August 2, 2021 (Doc. 8).  The matter has been briefed and is ripe for consideration.  (Docs. 11, 13, 14).

### A.    Relevant Statements

The ALJ summarized Plaintiff's statements and background as follows:

> [Plaintiff] reported that he is 6'4" and weighs 270 pounds (Ex. 1E/2). At the hearing, the claimant testified that numerous back injuries, high anxiety, and chronic migraines prevent him from being able to work full-time. He stated that he has pain in his lower back. He was currently not taking any medication for his pain, but had in the past. He stated the medication did help when he was on them. He was on gabapentin and then oxycodone. He stated that he also has leg pain, which feels like a burning sensation. He testified that with his anxiety, it gets to a point where he shuts down. H[e] experiences chest tightness and does not want to be around others. He gets flooded with emotions and becomes overwhelmed. He experiences panic attacks and how often he gets them depends on the situation. The attacks last between 5-15 minutes.

(Tr. 17).

### B.    Relevant Medical History

The ALJ summarized Plaintiff's medical records as to his mental health impairment as follows:

> The medical evidence shows that [Plaintiff] treated with Behavioral Health Care Partners for his mental health. [Plaintiff] was seen by a provider at that facility in April 2013. He had last been seen by the provider when he was in jail. He had since been released and wanted to return to Trileptal. His mental status exam was unremarkable (Ex. 1F/28). He was to increase Trazodone and restart Trileptal (Ex. 1F/29).
>
> At a follow up at Behavioral Health in May 2013, it was noted that [Plaintiff] was last seen in April (the month prior) and was returned to Trileptal for mood stabilization. [Plaintiff] reported that since then his mood had stabilized a great deal. He still had infrequent moodiness, but these episodes were quite manageable. He was sleeping well. His mental status exam was unremarkable (Ex. 1F/31). His diagnosis at that time was cyclothymic disorder, although the examiner noted she was unsure of that diagnosis and was considering a personality disorder. He was to continue Trileptal and Trazodone as prescribed with no changes, and was to return to the clinic in 3 months (Ex. 1F/32). There is no documentation of treatment after that for the next 2.5 years.

2

[Plaintiff] then reconnected with Behavioral Health again in November 2015. He wanted to get back to working on his bipolar disorder and underwent an intake evaluation (Ex. 1F/7). It was noted that he had previously been on medication and had been in counseling, but stopped treatment about a year prior for an unknown reason (Ex. 1F/15).

In December 2015, there is a note from Behavioral Health Partners that stated [Plaintiff] was a long-term patient of the facility. He had been going there on and off since childhood or adolescence. He was last seen on May 20, 2013. He had not been seen since then. At that May appointment, no changes had been made to his trileptal or his Trazodone. (Ex. 1F/34). [Plaintiff] endorsed a history of suicide attempts, the last one being in January of 2013, although the examiner noted that it was confusing as if it was really an attempt. [Plaintiff] was found to have borderline personality disorder and posttraumatic stress disorder. He was prescribed Sinequan and was to follow up with outpatient services (Ex. 1F/39).

It appears [Plaintiff] was later discharged from Behavioral Health in July 2017 due to lack of follow up (Ex. 1F/4).

[Plaintiff] established with a new primary care provider at Licking Memorial in May 2018. He wanted to discuss anxiety and migraines (Ex. 3F/41). At that time his mental status exam showed his judgment and insight were intact. He was oriented times three. His memory was intact for recent and remote events. His mood and affect were flat with an anxious affect. The doctor was going to request all of [Plaintiff]'s mental health records and also prescribed doxepin and trazodone (Ex. 3F/43).

The following month his exam again showed his judgment and insight were intact. He was oriented times three. His memory was intact for recent and remote events. His mood was upbeat but he had an anxious affect. Hydroxyzine was added for anxiety (Ex. 3F/37-38). By August 2018, his primary care provider had received [Plaintiff]'s past mental health records and changed his medications. He was to stop doxepin and trazodone and start sertraline with expected max benefit anticipated by 2 months of use (Ex. 3F/31, 33).

In October 2018, he saw a new primary care provider at Licking Memorial, Dr. De Leon, a sports and family medicine doctor. [Plaintiff] wanted to discuss anxiety (Ex. 3F/25). [Plaintiff] reported he was extremely frustrated with his previous primary care provider as he was taken off his medication and restarted on Zoloft without improvement of symptoms (Ex. 3F/27). At that time his BMI was 33.28. He appeared anxious and mildly angry at times during the interview (Ex. 3F/28). There are no positive findings from a mini mental status exam documented (Ex. 3F/28). [Plaintiff] was to start Paroxetine and restart Doxepin. He was given a small supply of Klonopin for daily as needed use (Ex. 3F/29). The following month,

3

[Plaintiff] reported improvement of mood and anger, but experienced side effects (Ex. 3F/21). He was to titrate off the Paroxetine and restart Alprazolom (Ex. 3F/23).

In late November 2018, he wanted to return to a trial of Paroxetine at a lower dosage (Ex. 3F/17). He reported that he felt as though that medication improved his overall depression and controlled his anxiety the most of any previously trialed. He noted mood control of acute anxiety issues with the use of Xanax and had not required it recently (Ex. 3F/15).

At a follow up in January 2019, [Plaintiff] reported having worsening uncontrolled anxiety. He reported issues leaving the house and noted a very short fuse when dealing with family members (Ex. 5F/19). Dr. de Leon noted that [Plaintiff] appeared extremely anxious and with pressured speech (Ex. 5F/21). He was to increase his Paxil (Ex. 5F/22). In February 2019, [Plaintiff] reported that he had established care with Dr. Jay at Licking Memorial Behavioral Health and would be transitioning care of his mental health to psychiatry after 4-5 months (Ex. 5F/8).

In February 2019 [Plaintiff] started counseling with Mr. Griffith at Restorative Solutions (Ex. 7F/9). His working diagnosis was major depressive disorder, recurrent severe without psychotic features (Ex. 7F/9).

In April 2019, [Plaintiff] had a new patient/initial assessment with psychiatrist Julia Ailabouni, MD, at Licking Memorial. He reported that he was not there for medication, as he liked his primary care physician prescribing Xanax and Paxil. He stated he was there only for a diagnosis. He reported constant mood swings and feeling anxious in a public setting. He denied a history of inpatient psychiatric hospitalization, but reported past outpatient treatment. His mental status examination showed that [Plaintiff] was alert and oriented to all spheres and was in no acute distress. There was no evidence of psychomotor abnormalities or internal stimulation. Speech was spontaneous uninterrupted with regular rate, rhythm, and volume. He was polite for the most part. He attempted to be cooperative but had difficulties with that and was attacking. He made appropriate eye contact. He described his mood as "fidgety anxious and depressed" and his affect was irritable. Thought process was linear, logical, and goal-directed. Thought content was free of hallucinations, delusions, or ideas of reference. He reported occasional auditory hallucination hearing his great grandmother calling his name when he was anxious and denied commands. He denied current suicidality/homicidality. He denied auditory or visual hallucinations. He did not appear to respond to internal or external stimuli. Memory and cognition were grossly intact. Judgment and insight were, fair. Impulse control was limited during the encounter that day. His diagnoses were PTSD, bipolar disorder mixed, social anxiety. [Plaintiff] stated he would like to continue his current prescribed medication by his primary care physician. His main goal was to establish a diagnosis and report continuing therapy with Mr. Griffith (Ex. 8F/11). [Plaintiff] was not seen again by Dr. Ailabouni.

At a follow up with Dr. De Leon in May 2019, [Plaintiff] reported that the issues with the recent loss of his grandmother had begun to die down and he felt his mood was gradually improving (Ex. 11F/39).

In August 2019, [Plaintiff] had a psychiatric consultative evaluation for Disability Determination Services (DDS) (Ex. 10F). At that time, he reported that he had never been psychiatrically hospitalized. He was currently a client at the Licking Memorial Outpatient Clinic and stated that he participated in counseling. His primary care physician, Dr. De Leon, prescribed his psychoactive medicines. [Plaintiff] was initially uncooperative during the interview, but then seemed to regain his composure (Ex. 10F/5). His speech was neither pressured nor slowed. He displayed no loose associations, flight of ideas, or delusional beliefs. His mood was anxious and irritable. He displayed an intense facial expression, and facial flushing. His complaints of limited energy and easy fatigability might have been suggestive of somatization. During the exam, [Plaintiff] was alert, responsive and oriented to time, place, person, and situation. He was not confused. His remote recall was adequate as he was able to provide personal and historical information without difficulty. As far as his short-term memory skills, [Plaintiff] recalled four digits forward. He recalled four digits backwards but not consistently. He remembered two of three objects after a five-minute delay. [Plaintiff] was able to follow the conversation during the interview. He did not ask the examiner to repeat and/or clarify questions. When asked to perform serial sevens, he made seven correct iterations in thirty seconds. He counted backwards from twenty by threes without committing an error. [Plaintiff] correctly mentally calculated twenty-four divided by three and one-quarter of 200. The examiner summarized that [Plaintiff] reported that he was seeking disability benefits because of emotional problems. He described a psychiatric condition that involves mood instability. In addition, he stated that he gets panic attacks. Finally, he reported trauma-related symptoms from childhood abuse. His diagnoses were unspecified bipolar and related disorder, panic disorder, and posttraumatic stress disorder (Ex. 10F/7).

In July 2019, [Plaintiff] told Dr. De Leon that he continued to have anxiety symptoms but that they had been stable since his last visit. He wanted to continue on his medications (Ex. 11F/21).

At his follow up with Dr. De Leon in January 2020, [Plaintiff] reported that he continued to work at Pizza Hut, but had to be moved to a different store due to a conflict with a manager. He was currently asymptomatic and was working no more than 20 hours per week (Ex. 13F/22). His anxiety and depression were noted as stable. He was to continue with Alprazolam (Ex. 13F/25).

In May 2020, [Plaintiff] reported to a different primary care physician at Licking Memorial, Dr. Barth. [Plaintiff] told Dr. Barth that he was weaning down off Xanax. Dr. Barth noted that the psychiatrist who had seen [Plaintiff] recommended against prescribing it, although [Plaintiff] stated that they had decided for Dr. de Leon to prescribe it. Dr. Barth discussed further psychiatric evaluation for a better

fit with medications and symptoms, but [Plaintiff] was unhappy and irritated by that (Ex. 16F/1). He was prescribed Lamictal (Ex. 16F/2).

He also continued to go to therapy with Mr. Griffith (Ex.'s 17F, 18F). Those treatment records show multiple cancellations by [Plaintiff]. The therapy notes concern [Plaintiff]'s issues and frustrations with his other medical care as well as his relationships with his significant other and family members, and his irritability with and frustrations surrounding what he apparently saw as the imperfections and "stupidity" of others. It is noted that he was at times accompanied to appointments by a friend or significant other and received some family/marriage therapy in regard to the relationship. It is noted that on June 29, 2020, the therapy note states he "has been doing very well personally & at work" (Ex. 17F/19), contrary to [Plaintiff]'s testimony on one week prior to this note that he was no longer working and had not been working since about early 2020. The therapy notes reference [Plaintiff]'s work at a pizza restaurant and his reports that he was doing well at work and was being groomed for a promotion to management or supervisory position.

(Tr. 18–21).

## C. The ALJ's Decision

The ALJ found that Plaintiff had not attained the age of 22 as of August 23, 2013, the amended alleged onset date of disability. (Tr. 13). The ALJ next found that Plaintiff last met the insured status requirement through September 30, 2012. (*Id.*). He had engaged in substantial gainful employment from August 1, 2019 through June 1, 2020, however, there has been a continuous 12-month period during which Plaintiff did not engage in substantial gainful activity. (*Id.*). The ALJ also determined that Plaintiff has the following severe impairments: lumbar spine degenerative changes, minimal to mild; borderline personality disorder; and posttraumatic stress disorder. (Tr. 14). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (*Id.*).

The ALJ assessed Plaintiff's residual functional capacity ("RFC") as follows:

After careful consideration of the entire record, [the ALJ] finds that the [Plaintiff] has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except frequent climbing ramps and stairs, balancing and stooping; no climbing ladders, ropes or scaffolds; no work around unprotected heights, open flames, or unprotected dangerous machinery; no concentrated exposure to vibrations (example: vibrating tools or surfaces); no more than moderate noise

6

levels (per DOT description – i.e., office level noise); simple, routine tasks involving simple work-related decisions; not requiring a fast production rate pace; infrequent changes in work routine; occasional, brief interaction with coworkers and supervisors and no interaction with the public.

(Tr. 16–17).

As for the allegations about the intensity, persistence, and limiting effects of Plaintiff's symptoms, the ALJ found that they are not sufficiently supported by the objective medical evidence. (Tr. 17). The ALJ also noted, "As for his mental health, again, his treatment has been conservative with medications prescribed by his primary care provider. He does not follow with a psychiatrist or psychologist…. There is no higher level of care such as intensive outpatient treatment and the claimant does not go to the emergency department for mental health symptoms." (Tr. 23–24).

The ALJ relied on testimony from a Vocational Expert ("VE") to determine that Plaintiff was unable to perform his past relevant work experience as a cashier. (Tr. 26–27). Further, relying on the VE's testimony, the ALJ determined that given Plaintiff's age, education, work experience and RFC, he was able to perform work that existed in significant numbers in the national economy, such as a cleaner II, sorter or inspector hand packer. (Tr. 27–28). Consequently, the ALJ concluded that Plaintiff has not been under a disability, as defined in the Social Security Act, since August 23, 2013. (Tr. 28).

## II.    STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*

*v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III. DISCUSSION

Plaintiff's sole alleged error is that the ALJ's RFC determination is not supported by substantial evidence because the ALJ improperly weighed the medical opinion evidence. More specifically, Plaintiff challenges the ALJ's evaluation of his mental health and his ability to interact with others.

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F.App'x 149, 155 (6th Cir. 2009). *See also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The Social Security regulations, rulings, and Sixth Circuit precedent provide that the ALJ is charged with the final responsibility in determining a claimant's residual functional capacity. *See, e.g.*, 20 C.F.R. § 404.1527(d)(2) (the final responsibility for deciding the residual functional capacity "is reserved to the Commissioner"). And it is the ALJ who resolves conflicts in the medical evidence. *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). Substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010). To do so, an ALJ must evaluate several factors, including the medical evidence (not limited to medical opinion testimony) and the claimant's testimony. *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010) (citing

*Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004)).  The RFC assessment must be based on all the relevant evidence in her case file.  20 C.F.R. § 416.945(a)(1).

Plaintiff filed his application after May 23, 2017, so it is governed by the relatively new regulations describing how evidence is categorized, considered, and articulated when an RFC is assessed.  *See* 20 C.F.R. §§ 404.1513(a), 404.1520c, 416.913(a), 416.920c (2017).  Taken together, the regulations describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings.[1]  20 C.F.R. §§ 404.1513(a)(1)–(5); 416.913(a)(1)–(5).

Regarding two of these categories (medical opinions and prior administrative findings), an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from the claimant's medical sources."  20 C.F.R. §§ 404.1520c(a); 416.920c(a).  Instead, an ALJ must use the following factors when considering medical opinions or administrative findings: (1) "[s]upportability"; (2) "[c]onsistency"; (3) "[r]elationship with the claimant"; (4) "[s]pecialization"; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability programs policies and evidentiary requirements."  §§ 404.1520c(c)(1)–(5); 416.920c(c)(1)–(5). Supportability and consistency are the most important of the five factors, and the ALJ must explain how they were considered.  §§ 404.1520c(b)(2); 416.920c(b)(2).  An ALJ may discuss how he or

---

[1] The regulations define prior administrative findings:

A prior administrative finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (see § 416.1400) in your current claim based on their review of the evidence in your case record . . .

§§ 404.1513(a)(2), (5); 416.913(a)(2), (5).

she evaluated the other factors but is not generally required to do so. *Id.* Thus, the role of the ALJ is to articulate how she considered medical opinions and how persuasive she found the medical opinions to be. *Holston v. Saul*, No. 1:20-CV-1001, 2021 WL 1877173, at *11 (N.D. Ohio Apr. 20, 2021), *report and recommendation adopted*, No. 1:20 CV 1001, 2021 WL 1863256 (N.D. Ohio May 10, 2021).

The role of the Court is not to reweigh the evidence but to confirm that the ALJ employed the proper legal standard by considering the factors and supported the conclusion with substantial evidence. *Id.*, at *14. The ALJ's role is to determine the RFC based on his evaluation of medical and non-medical evidence. "Ultimately, 'the ALJ must build an accurate and logical bridge between the evidence and his conclusion.'" *Davis v. Commissioner of Soc. Sec.*, No. 2:19-CV-265, 2019 WL 5853389, at *5 (S.D. Ohio Nov. 8, 2019), *report and recommendation adopted*, No. 2:19-CV-265, 2020 WL 1482318 (S.D. Ohio Mar. 27, 2020) (quoting *Waye v. Comm'r of Soc. Sec.*, No. 1:18-CV-201, 2019 WL 364258, at *5 (S.D. Ohio Jan. 30, 2019), *report and recommendation adopted*, No. 1:18CV201, 2019 WL 718542 (S.D. Ohio Feb. 20, 2019)).

Here, the ALJ determined that Plaintiff had "the residual functional capacity to perform medium work" and, notably, is limited to "occasional, brief interaction with coworkers and supervisors and no interaction with the public." (Tr. 16–17). In making this determination, the ALJ thoroughly considered the record.

First, the ALJ described Plaintiff's treatment history. (Tr. 14–24). The ALJ noted that medication had been effective at managing Plaintiff's symptoms, such as mood stability, depression, and anxiety. (Tr. 18 (citing Tr. 427), Tr. 19 (citing Tr. 459, 453), Tr. 20 (citing 656)). Further, those symptoms appeared to fluctuate in intensity throughout Plaintiff's treatment history and were often noted to be managed. (Tr. 18 ("He still had infrequent moodiness, but these

episodes were quite manageable."); *id.* ("His mood and affect were flat with an anxious affect.");
*id.* ("His mood was upbeat but he had an anxious affect."); Tr. 19 ("He appeared anxious and
mildly angry at times during the interview (Tr. 466)."); *id.* ("the claimant reported improvement
of mood and anger . . . (Tr. 459)."); *id.* ("the claimant reported having worsening uncontrolled
anxiety . . . and noted a very short fuse when dealing with family members (Tr. 525)."); Tr. 20
("he continued to have anxiety symptoms but that they had been stable since his last visit. . . . (Tr.
656)."); *id.* (citing Tr. 718)).  The ALJ also discussed Plaintiff's pattern of failure to participate
actively in treatment.  (Tr. 18 ("There is no documentation of treatment after that for the next 2.5
years."); *id.* ("It appears that claimant was later discharged from Behavioral Health in July 2017
due to lack of follow up."); Tr. 21 ("Those treatment records show multiple cancellations.")).  And
finally, the ALJ detailed Plaintiff's ability to work and interact with his family, (Tr. 20 (citing
715); Tr. 21 (citing 791)), but also noted his conflict with his manager and frustrations with family
members (Tr. 19 (citing Tr. 525); Tr. 21 (citing 773–822)).

Ultimately, the ALJ determined that the record did not entirely support Plaintiff's alleged
symptoms, and therefore did not support his alleged loss of functioning.  (Tr. 24).  Rather, the ALJ
noted that Plaintiff had received conservative treatment for his mental health, had not required
higher-level or emergency care, and was overall "maintained on medications."  (*Id.*).  To the extent
that he had mental health limitations, the ALJ stated that those were "accommodated in the residual
functional capacity by limiting him to simple, routine tasks and limited social interactions, among
others."  (*Id.*).

Next, the ALJ considered the medical opinions of Plaintiff's primary care physician, Dr.
de Leon; the state agency psychological consultant; consultative examiner Dr. Griffiths; and

Plaintiff's therapist, Mr. Griffith[2]. She concluded that none of these opinions are persuasive regarding Plaintiff's mental health. (Tr. 24–26). Plaintiff disputes this determination. (Doc. 11 at 18).

Plaintiff argues that the ALJ's conclusion that Dr. de Leon's opinion was unpersuasive is erroneous. (Doc. 11 at 18). Specifically, Plaintiff argues the ALJ did not properly consider evidence indicating Plaintiff had difficulties in social interactions, such as Plaintiff's arguments with managers; inappropriate interactions with his girlfriend; and uncooperative approach with treatment providers. (*Id.*). This error was harmful, Plaintiff says, because Dr. de Leon's limitations, if properly considered, would have resulted in Plaintiff meeting a listing impairment and being found disabled. (Doc. 11 at 20).

As to Dr. de Leon's opinion, the ALJ explained:

In January 2018, [Plaintiff]'s primary care physician, Dr. De Leon, wrote a letter stating that after a thorough evaluation and lengthy discussion of [Plaintiff]'s history and review of his previous medical records, his overall physical health has been found to be satisfactory. His mental health, however, appears to be poorly controlled and unlikely to improve given his current diagnoses of Post-Traumatic Stress Disorder (PTSD) and Borderline Personality Disorder with features of uncontrolled anxiety and panic disorder. He stated, "It is therefore in my opinion, that [Plaintiff]'s condition is not expected to have meaningful improvement to the point of returning to regular work and he should therefore be deemed disabled" (Ex. 2F/2). This is not a medical opinion under the regulations, as it does not provide a function[-]by[-]function analysis of limitations imposed by an impairment(s). Thus, this is inherently neither valuable nor persuasive in accordance with 20 CFR 404.1520b(c) and 416.920b(c). I would also note that Dr. De Leon is a primary care physician, not a mental health professional. He prescribes [Plaintiff] psychiatric medications, and essentially maintains [Plaintiff] on the same ones. Dr. De Leon does not consistently perform mini mental status exams on [Plaintiff], or at least does not document them in his treatment notes. He makes findings regarding [Plaintiff]'s appearance in his general notes of the physical exam, but no further details regarding his mental functioning or appearance are noted. His treatment notes mainly consist of subjective allegations from [Plaintiff] regarding his mental health. His notes do not contain objective findings that support a finding of

_____

[2] Plaintiff in his Statement of Errors refers to "LMFT Griffith", but the record reflects that Mr. Griffith is an Individual Marriage and Family Therapist or "IMFT." (*see e.g.,* Tr. 691).

disability based on [Plaintiff]'s mental health. This statement does not inform the residual functional capacity finding in any meaningful way.

In May 2019, Dr. De Leon, filled out a medical statement regarding [Plaintiff]'s mental health (Ex. 9F). Dr. De Leon found [Plaintiff] to have marked restriction in activities of daily living and extreme difficulty in maintaining social functioning. He opined [Plaintiff] had repeated episodes of decompensation. Dr. De Leon found [Plaintiff] to be extremely impaired in the ability to work in coordination with and proximity of others without being distracted by them and in the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Dr. De Leon found [Plaintiff] to be markedly impaired in the ability to maintain attention and concentration for extended periods and in the ability to respond appropriately to changes in the work setting. Dr. De Leon found [Plaintiff] to be extremely impaired in the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes (Ex. 9F/4). This opinion is not persuasive. Marked and extreme limitations are not supported in the record. For example, although part-time, [Plaintiff] was able to work at a pizza place which shows he is capable of being around others to some extent. As discussed above in regard to the B criteria in assessing mental functioning, [Plaintiff] demonstrates the ability to understand, remember and carry out simple, routine type tasks, such as self-cares, caring for his elderly grandmother for a period, working as co-manager at a restaurant for several months, caring for his hobbies and playing video games. The mental status findings in the record, and his presentations for the various evaluations and treatment visits show the ability to focus and participate in his own health care. While he has some difficulty interacting in part due to his expectations for others and his apparent frustrations with their perceived imperfections and "stupidity", as his therapist's notes reflect, he has had a significant other, he is able to communicate adequately and regularly with his therapist and primary care provider and he interacts with his family. He has hobbies and interests and is independent in self-cares. Contrary to Dr. de Leon's statement that [Plaintiff] has had repeated episodes of decompensation, while the record references a history of drug use including amphetamines and incarceration within the last decade (1F), the record does not document hospital admissions for mental health treatment, emergency room treatment, or even any recommendations for admission, or for partial hospitalization or intensive outpatient therapy (IOP) for any mental health condition. Certainly episodes of decompensation are not documented in this record. The objective evidence and the course of treatment fails to support this opinion. . .

In January 2020, Dr. De Leon again wrote a letter stating that he had re-reviewed [Plaintiff]'s previous evaluations by other practitioners including diagnoses and workup at length. [Plaintiff] has been seen/treated by multiple Psychiatrists and Psychologists and has been diagnosed with Post-Traumatic Stress Disorder, Borderline Personality Disorder, Obsessive-Compulsive Disorder, and resistant Anxiety and Depression. After re-evaluation and discussion with claimant regarding his current state of health, Dr. De Leon did not feel that [Plaintiff] could maintain normal fulltime employment at that time. It was therefore Dr. De Leon's

13

> recommendation that [Plaintiff] be considered disabled at that time (Ex. 12F/4). Again, this is not a medical opinion and is inherently neither valuable nor persuasive in accordance with 20 CFR 404.1520b(c) and 416.920b(c).

(Tr. 25–26).

The ALJ concluded that Dr. de Leon's January 2018 and January 2020 letters are not medical opinions and are therefore not persuasive. A medical opinion is "a statement from a medical source about what [Plaintiff] can still do despite [his] impairment . . . ." 20 C.F.R. § 404.1513(a)(2). This opinion can discuss impairment-related limitations on Plaintiff's ability to "perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting . . . ." 20 C.F.R. § 404.1513(a)(2)(ii).

Yet, under the regulations, some evidence is neither valuable nor persuasive. 20 C.F.R. § 404.1520b(c). For such evidence, the ALJ is not required to "provide any analysis about how [she] considered such evidence in [her] determination or decision, even under § 404.1520c . . . ." *Id.* This evidence includes statements on issues reserved to the ALJ such as "statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work." 20 C.F.R. § 404.1520b(c)(3)(i). This is so because only the ALJ is responsible for making that ultimate determination. 20 C.F.R. § 404.1520b(c)(3); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir.1985)) ("The determination of disability is ultimately the prerogative of the Commissioner, not the treating physician.").

The ALJ correctly determined that Dr. de Leon's January 2018 and January 2020 letters are not medical opinions and thus are neither valuable nor persuasive evidence. Each of Dr. de Leon's letters provided conclusory determinations about disability, instead of functional analysis

of the Plaintiff's capabilities and limitations.  In his January 2018 letter, he stated his opinion "that [Plaintiff's] condition is not expected to have meaningful improvement to the point of returning to regular work and he should therefore be deemed disabled."  (Tr. 438).  In his January 2020 letter, he similarly stated, "I do not feel that [Plaintiff] can maintain normal fulltime employment at this time. It is therefore my recommendation that he be considered disabled at this time."  (Tr. 692).  Dr. de Leon simply offered opinions about legal determinations, which are exclusively the province of the ALJ.  Thus, with regard to the letters, it was proper for the ALJ to conclude that they were not valuable or persuasive evidence.

As for Dr. de Leon's May 2019 statement, the ALJ noted that it was a medical opinion but found it unpersuasive.  (Tr. 25).  Notably, because the statement was in the form of a checklist, without any additional comments or annotation, it lacked any supporting explanations or citations to relevant medical evidence, which are central to the supportability factor.  (Tr. 621–25).  Nor did the ALJ find that Dr. de Leon's opined "[m]arked and extreme limitations" were consistent with the evidence of record.  (Tr. 25).  The ALJ noted that Plaintiff worked at a pizza place, has a significant other, and interacts with his family, which all demonstrate that he is capable of being around and interacting with others.  (*Id.*).  Plaintiff also had the ability to adequately communicate with his therapist and primary care provider.  (*Id.*).  And though Dr. de Leon's statement suggested Plaintiff has had repeated episodes of decompensation, that is not documented in the record through hospital admissions for mental health treatment, recommendations for admission, partial hospitalization, or intensive outpatient therapy (IOP) for any mental health condition.  (Tr. 25–26).

Further, because the ALJ found Plaintiff had only moderate limitations in the four broad areas of functioning (Tr. 15–16), she found Dr. de Leon's findings of extreme and marked limitations unsupported by the record (Tr. 25).  Regarding understanding, remembering, and

applying information, the ALJ cited Plaintiff's daily reading (Tr. 15 (citing Tr. 340)), his therapist's finding that he can follow directions (*id.* (citing Tr. 602)), the consultative evaluation which showed he could follow instructions and remember but that he performed marginally on a simple structured task (*id.* (citing Tr. 632)).  Regarding interacting with others, she noted Plaintiff's ability to live with his father and grandmother, and trips with his friends.  (*Id.* (citing Tr. 781, 786)).  But she noted Plaintiff's anxiety and agitation with people including his difficulty leaving his home and being in unfamiliar environments (*id.* (citing Tr. 504)), and that he buys groceries late at night to avoid people (*id.* (citing Tr. 630)).  Regarding concentration, persistence, and pace, the ALJ noted that Plaintiff did not report memory or concentration problems (*id.* (citing Tr. 336–343, 479)), and that his therapist found that he can hold his attention, have conversations, and persist at tasks in isolation or with limited pressure and oversight (Tr. 16 (citing 602)).  But the ALJ considered that Plaintiff's primary care physician notes issues with concentration due to anxiety, frustration when he does not achieve a desired social outcome, agitation, and anger.  (*Id.* (citing Tr. 504)).  Lastly, regarding Plaintiff's ability to adapt or manage himself, the ALJ noted that he prepares simple meals, does his laundry, and has hobbies, (*id.* (citing Tr. 336–343)), he also watches television and uses his phone, attends to his own grooming and hygiene, does household chores, counts money, pays bills, and has a driver's license (*id.* (citing Tr. 630)).

In addition to supportability and consistency, the ALJ considered Dr. de Leon's specialization and treatment history.  The ALJ noted that Dr. de Leon is a "primary care physician, not a mental health practitioner."  (Tr. 25).  As such, Dr. de Leon does not consistently perform mini mental status exams.  (*Id.*).  Instead, as the ALJ noted, it appears that Dr. de Leon simply prescribes psychiatric mediations and maintains Plaintiff on them.  (*Id.*).  Likewise, the ALJ noted

16

that Dr. de Leon's treatment notes show findings about Plaintiff's appearance but do not further detail mental functioning, and the notes contain mostly Plaintiff's subjective allegations.  (*Id.*).

In sum, the ALJ considered Dr. de Leon's medical opinion, evaluated it based upon the record as a whole, and found it to be unpersuasive.  The ALJ's discussion allowed the Undersigned to determine if the proper factors, supportability and consistency, were considered and conclude that the ALJ's determination is supported by substantial evidence.  Thus, the ALJ's evaluation of Dr. de Leon's opinion is not erroneous.

Plaintiff argues that the ALJ, when evaluating Dr. de Leon's opinion, did not properly consider evidence indicating Plaintiff had difficulties in social interactions such as Plaintiff's arguments with managers (Doc. 11 at 17 (citing Tr. 715, 781)), inappropriate interactions with his girlfriend (*id.* (citing Tr. 495, 430, 618–19, 803, 781)), and uncooperative approach with treatment providers (*id.* (citing Tr. 495, 770).  Plaintiff also argues the ALJ ignored evidence of Plaintiff's flat/anxious affect (*id.* at 18 (citing 481, 475, 471), anxiety, depression, anger, and irritability (*id.* at 18–19 (citing Tr. 410, 430, 432, 466, 618–19, 662, 802)), and pressured speech (*id.* at 18 (citing Tr. 527)).  But as noted above, the ALJ extensively considered the record as a whole when evaluating the persuasiveness of Dr. de Leon's opinion and crafting the RFC.

Further, "an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered."  *Dykes ex rel. Brymer v. Barnhart*, 112 F. App'x 463, 467 (6th Cir. 2004).  Here, the ALJ did explicitly consider some of the evidence Plaintiff points to throughout the opinion.  (*See, e.g.*, Tr. 19 (citing 619), Tr. 20 (citing 715), Tr. 21 (citing 774–794)).  Finally, Plaintiff's allegation that the ALJ "impermissibly picked and chose through the record," (Doc. 14 at 3), is "frequently made and seldom successful, because 'the same process can be described more neutrally as weighing the evidence.'"  *Downs v.*

17

*Commissioner of Soc. Sec.*, No. 2:19-CV-3699, 2020 WL 1684811, at *6 (S.D. Ohio Apr. 7, 2020), *report and recommendation adopted sub nom. Downs v. Comm'r of Soc. Sec.*, No. 2:19-CV-3699, 2020 WL 2216861 (S.D. Ohio May 7, 2020) (quoting *Smith v. Comm'r of Soc. Sec.*, No. 1:14-CV-984, 2015 WL 7460080, at *3 (W.D. Mich. Nov. 24, 2015)).

Plaintiff also argues that the ALJ's evaluation of the state agency psychological consultant's opinion was erroneous. (Doc. 11 at 16–18). In response, Defendant says: "Plaintiff fails to recognize that, in fact, the ALJ found [the state agency psychological consultant's] opinion unpersuasive because the ALJ believed the evidence warranted stricter social limitations than those opined by her." (Doc. 13 at 1). And, Defendant says, "Plaintiff does not argue that there were limitations in that opinion that required the ALJ to craft a more restrictive RFC." (*Id.* at 4–5). Plaintiff does not refute this and in reply acknowledges that this error was not harmful. (Doc. 14 at 2 ("The ALJ still erred, though the particular error with the state agency's opinion did not result in harm.")).

Plaintiff has the burden of proof to show that the alleged error was harmful. *Click v. Comm'r of Soc. Sec. Admin.*, No. 1:13CV943, 2014 WL 3543798, at *12 (N.D. Ohio July 17, 2014); *see also Rosshirt v. Comm'r of Soc. Sec.*, No. 2:19-CV-3280, 2020 WL 1465786, at *6 (S.D. Ohio Mar. 26, 2020), *report and recommendation adopted*, No. 2:19-CV-3280, 2020 WL 4592393 (S.D. Ohio Aug. 11, 2020) (citing *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)); *Jackson on behalf of R.B. v. Comm'r of Soc. Sec.*, No. 1:20-CV-00339, 2021 WL 3508072, at *2 (S.D. Ohio Aug. 10, 2021) ("In federal court, the claimant carries the burden of showing that an ALJ prejudicially erred."). Here, Plaintiff admits that this alleged error was not harmful. (Doc. 14 at 2). This concession is fatal to Plaintiff's argument for remand regarding this error. *See Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654–55 (6th Cir. 2009) ("[I]f an agency has

failed to adhere to its own procedures, we will not remand for further administrative proceedings unless 'the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.'"); *Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005) (citation and quotations omitted) ("[N]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

Even so, the ALJ properly evaluated the opinion of the state agency psychological consultant and found it to be internally inconsistent and unsupported by the record. (Tr. 24). The opinion, the ALJ said, is inconsistent because it states that Plaintiff has a marked limitation in social functioning but then does not limit his contact with the public. (*Id.*). In contrast, the adopted RFC does limit Plaintiff's contact with the public. (Tr. 17). The ALJ also concluded that a marked limitation in social functioning is not supported by the record evidence that Plaintiff has friends, had a girlfriend, lives with family, vacationed, and was able to work a part-time public service job at a restaurant. (Tr. 24). This evaluation of the state agency opinion is not erroneous.

Finally, Plaintiff makes a passing reference to the ALJ's conclusions regarding the opinions of consultative examiner Dr. Griffiths and Plaintiff's therapist Mr. Griffith. (Doc. 11 at 18). Regarding both, the ALJ concluded that no functional limitations that would inform the RFC were provided, so the ALJ found them of little use. (Tr. 26). Upon independent review, (s*ee* Tr. 632–33; 690–91), the Undersigned agrees with this assessment. Still more, even though the records were not determined to be medical opinions, the ALJ did consider them. (Tr. 19–21). And the Undersigned notes that Plaintiff does not develop an argument related to these two opinions.

Ultimately, the ALJ's analysis of Plaintiff's RFC allowed the Court to conduct a meaningful review of the decision. The ALJ built a logical bridge between the evidence, including

Plaintiff's medical records and medical opinions, and her conclusion.  The RFC, including its limitation on Plaintiff's interaction with coworkers and supervisors and exclusion of interaction with the public, is supported by substantial evidence.  Accordingly, the Undersigned finds no error.

In essence, Plaintiff wishes "the ALJ had interpreted the evidence differently." *Glasgow v. Comm'r of Soc. Sec.*, No. 2:15-CV-1831, 2016 WL 2935666, at *7 (S.D. Ohio May 20, 2016), *report and recommendation adopted*, No. 2:15-CV-01831, 2016 WL 4486936 (S.D. Ohio Aug. 26, 2016), *aff'd*, 690 F. App'x 385 (6th Cir. 2017).  But the law prohibits the Court from reweighing the evidence and substituting its judgment for that of the ALJ.  *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995) ("This court reviews the entire administrative record, but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ.").

## IV.    CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that Court **OVERRULE** Plaintiff's Statement of Errors (Doc. 11) and **AFFIRM** the Commissioner's decision.

## V.    PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s).  A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made.  Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further

evidence or may recommit this matter to the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.

Date: March 25, 2022

/s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE